# EXHIBIT A

IN THE CIRCUIT COURT OF DUPAGE COUNTY, ILLINOIS
EIGHTEENTH JUDICIAL CIRCUIT

Candice Adams
e-filed in the 18th Judicial Circuit Court
DuPage County
ENVELOPE: 15954744
2021CH000475
FILEDATE: 12/14/2021 4:26 PM
Date Submitted: 12/14/2021 4:26 PM
Date Accepted: 12/15/2021 1:59 PM
SK

Smart Mortgage Centers, Inc.
**PLAINTIFF**

v.

Case No. **2021CH000475**

Ryan Klaic

**DEFENDANT**

VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY JUDGMENT
AND OTHER RELIEF

Plaintiff, Smart Mortgage Centers, Inc., an Illinois corporation, hereby alleges against

Defendant Ryan Klaic the following:

## I. PARTIES

1. Plaintiff, Smart Mortgage Centers, Inc., (hereafter "Smart Mortgage") is an Illinois
   corporation in good standing located at 16151 S. Lincoln Hwy, Plainfield, IL 60586.

2. Defendant, Ryan Klaic, (hereafter "Klaic") is an individual residing at 4N438 Robert Penn
   Warren Cove, St. Charles, Illinois 60175.

## II. JURISDICTION AND VENUE

3. Defendant Klaic signed a Loan Officer Retention Agreement with a venue selection clause
   allowing for the Circuit Court of DuPage County, Illinois to be a proper venue.

## III. FACTUAL BACKGROUND

### Smart Mortgage

4. Smart Mortgage is a mortgage brokerage firm that has been in operation since 1997.

5. Smart Mortgage provides mortgage services and products to consumers in several states, including Illinois, Indiana, Florida, Colorado, and Virginia.

**Klaic's Employment with Smart Mortgage**

6. On June 1, 2011, Klaic began his employment with Smart Mortgage as a licensed loan originator with Smart Mortgage's Naperville, Illinois office.

7. Klaic signed three Loan Officer Retention Agreements with Smart Mortgage during his employment tenure with Smart Mortgage from June 1, 2011 to August 6, 2021.

8. In each instance, Klaic agreed to financial compensation and continuing employment in exchange for signing the Loan Officer Retention Agreements.

9. In 2020, Klaic signed his final Loan Officer Retention Agreement with Smart Mortgage.

10. The 2020 Loan Officer Retention Agreement increased Klaic's financial compensation with Smart Mortgage from the preceding Loan Officer Retention Agreement that was signed on December 27, 2018.

11. Klaic was offered and agreed to compensation in exchange for signing the 2020 Loan Officer Retention Agreement.

12. As a loan officer at Smart Mortgage, it was Klaic's primary role to market and sell mortgage products and services directly to new and existing residential customers.

13. Klaic's primary duties were expanding the scope of Smart Mortgage's relationship with existing customers, identifying and developing new customers including those developed through Smart Mortgage's centralized client database and advertising and marketing efforts, staying updated on the real estate market, advising customers and prospects on the products

and services offered by Smart Mortgage, quoting interest rates for customers, and ensuring that customers were satisfied with the mortgage products or services purchased.

14. Klaic generally communicated with customers via telephone, email, text, and in person.

15. To assist Klaic with closing deals, Smart Mortgage gave Klaic exclusive leads for potential new customers and assigned him a number of existing customer leads.

16. Klaic benefited from Smart Mortgage's client database and centralized marketing campaigns, which were conducted by targeted communications to Smart Mortgage's customers and prospects, including those serviced by, or assigned to Klaic.

17. The residential consumer market is very competitive and requires a great deal of time, effort, and expense to correctly identify exclusive client leads and to gain the trust and loyalty of clients.

18. To facilitate this process, Smart Mortgage spends and has spent hundreds of thousands of dollars on marketing and advertising over two decades to generate exclusive client leads for its loan officers.

19. Smart Mortgage devotes considerable resources to maintaining customer relationships.

20. To develop customer loyalty, Smart Mortgage consistently delivers excellent customer service and competitive interest rate pricing.

21. To promote excellent customer service, Smart Mortgage maintains a client database that contains information about each customer's financial and credit profile, personal circumstances, preferences, and detailed loan purchase history, including the loan value and interest rates of the types of loan products and services the customer has historically purchased.

21. Smart Mortgage's loan officers use its client database to identify new refinancing opportunities for its clients.

23. Because Smart Mortgage places a premium on maintaining customer relationships, its loan officers are required to update Smart Mortgage's client database with any new information they receive about their customers; including changes in their financial and credit profile, personal circumstances, employment, and other preferences.

24. Smart Mortgage is able to stay updated on its clients' unique needs and can seamlessly transition customers to a new or different loan officer if necessary.

25. As a Loan Officer, Klaic also had access to confidential information with respect to Smart Mortgage's available lenders, special mortgage programs, and interest rates.

26. The interest rate Smart Mortgage offers a customer for a specific product can be different from the price another provider offers, based not only on Smart Mortgage's profit margin but also on the special interest rates and programs Smart Mortgage receives from the lender, which could be different than the interest rates available to a competitor.

27. Smart Mortgage derives economic value from its client database because the database exclusively contains individuals who have sought mortgage services with Smart Mortgage.

28. Smart Mortgage's client database was created with the investment of substantial expenditures, skills, sweat equity, and time.

29. Most importantly, Smart Mortgage's client database information would be invaluable to a competitor because a competitor could use that information to have access to customer information that would otherwise be unavailable to the competitor.

30. Similarly, if a competitor had access to Smart Mortgage clients that Smart Mortgage had historically sold or intended to sell mortgages to a residential customer, along with the customer's particular preferences, the competitor could easily target the customer for the same products and services, matched precisely to the customer's specific needs.

31. Accordingly, Smart Mortgage takes extensive measures to protect its confidential and trade secret information.

**Smart Mortgage's Measures to Protect its Confidential and Trade Secret Information**

32. Among other security measures, Smart Mortgage protects its confidential and trade secret information by utilizing surveillance cameras, limiting and restricting access to authorized employees, and establishing and enforcing policies to protect confidential and trade secret information.

33. Smart Mortgage's confidential information is created, stored, and accessed by a secured network.

34. Smart Mortgage's computer systems have safeguards to prevent unauthorized access to company information.

35. Users of Smart Mortgage's networked systems must have a unique identifier or account number as well as a verified password.

36. Before access to Smart Mortgage's networked systems is granted, users must be identified and their need for access must be verified.

37. Access to Smart Mortgage's networked systems is provided only on a need-to-know basis.

38. In addition to these measures, Smart Mortgage also uses employment agreements containing restrictive covenants and maintains companywide employment policies to further protect its confidential and trade secret information.

## Klaic's June 1, 2011 Loan Officer Retention Agreement Non-Disclosure and Non-Solicitation

39. Smart Mortgage extended an offer of employment to Klaic on or about June 1, 2011. The offer of employment was conditioned on Klaic's execution of a Loan Retention Agreement consisting of Non-Disclosure and Non-Solicitation provisions.

40. On or about June 1, 2011, the same day he began working for Smart Mortgage, Klaic agreed to be bound by the terms of the Agreement and returned an executed copy of the Agreement to Smart Mortgage.

41. The Agreement contains a number of tailored restrictions on Klaic's post-employment activities.

42. First, Paragraph 16 of the Agreement restricts Klaic's use of confidential information:

> Loan Officer recognizes that Smart has and will have information such as customer names, customer lists, leads, customer files, mortgage loan documentation, and other confidential information regarding Smart's business operations ("Information"). Loan Officer agrees that Loan Officer will not, at any time nor in any manner, either directly or indirectly, use any "Information" for Loan Officer's own benefit, or divulge, disclose, or communicate in any manner any "Information" to any third party, without the prior written consent of Smart. Loan Officer will protect the "Information" and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement and shall entitle Smart to seek injunctive relief as well as damages.

43. Second, Paragraph 17 of the Agreement states, in relevant part:

> Upon termination of the Loan Officer's employment with Smart, Loan Officer, within twenty-four (24) hours, shall immediately deliver all customer names, customer files, records, notes, door keys, data (i.e. computer processing data) in his/her possession, or under Loan Officer's control that are Smart's property or relate to Smart's business.

44. Paragraph 16 of the Agreement also restricts Klaic from doing business with

   Smart Mortgage customers for a one-year period after termination of his employment

   with Smart Mortgage.

> Loan Officer agrees and acknowledges that he or she shall not do business with any customer of Smart, including those Smart customers that were produced by Loan Officer during the term of the agreement for a period of one (1) year from the date of Loan Officer's termination of employment with Smart. Loan Officer agrees to advise Smart within twenty-four (24) hours of the time of such customer contact in writing if he or she is contacted by a Smart customer, seeking to procure a mortgage loan within the one (1) year period following the Loan Officer's termination of employment with Smart. Loan Officer will take no further action to complete a loan for the Smart customer without the prior written consent of Smart.

45. Klaic was continuously employed for a substantial period of time from June 1, 2011

   to his resignation date of August 6, 2021.

**Klaic's Termination and Breach of the Agreement**

46. On or about August 6, 2021, Klaic voluntarily terminated his employment with Smart

   Mortgage.

47. Smart Mortgage subsequently discovered that, immediately prior to his departure on

   August 6, 2021, Klaic assessed and misappropriated confidential data files.

48. Paul Stretavong, Smart Mortgage's Information Technology Manager, discovered

   Klaic's unauthorized access of Smart Mortgage's client database.

49. Klaic exceeded his authorization as a Smart Mortgage employee when he accessed,

   downloaded, and misappropriated Smart Mortgage's client database for his own

   personal and financial benefit.

50. Smart Mortgage's client database includes unique client names relating to closed loans, denied loans, and archived records not known or available to the general public.

51. Smart Mortgage's client database also includes personal identifying information, historical client information, client preferences, and personalized notes.

52. Klaic misappropriated Smart Mortgage's client database, including unique client names related to closed loans, denied loans, and archived records not known or available to the general public.

53. Klaic misappropriated Smart Mortgages's confidential and trade secret information prior to his departure from Smart Mortgage on August 6, 2021.

54. At no time did Klaic contact Smart Mortgage to notify it that a Smart Mortgage client had contacted him seeking to procure a mortgage loan after he voluntarily terminated his employment with Smart Mortgage on August 6, 2021.

55. Klaic has closed at least one loan with a Smart Mortgage client after he resigned from Smart Mortgage without the prior written consent of Smart Mortgage.

56. Smart Mortgage was Klaic's only employer from June 1, 2011 to August 6, 2021.

57. Klaic received revenues from the confidential client data that he misappropriated from Smart Mortgage.

58. On August 6, 2021, Klaic began his employment with Nexa Mortgage.

59. From August 6, 2021 and continuing to the present, Klaic has solicited and offered mortgage services to an unknown number of individuals from Smart Mortgage's client database.

60. The computer files that Klaic misappropriated from Smart Mortgage contained detailed confidential information and trade secrets relating to Smart Mortgage customers.

61.  Klaic continues to use the misappropriated confidential client information and trade secrets
     from Smart Mortgage for his own personal and financial benefit by closing loans with
     Smart Mortgage customers

**Klaic's December 27, 2018 Loan Retention Agreement Non-Disclosure and Non-Solicitation**

62.  Klaic signed a second agreement with Smart Mortgage on or about December 27, 2018.

63.  Klaic's continued employment was conditioned on Klaic's execution of a Loan Officer
     Retention Agreement consisting of Non-Disclosure and Non-Solicitation provisions.

64.  On December 27, 2018, Klaic agreed to be bound by the terms of the December 27, 2018
     Agreement, and returned an executed copy of the Agreement to Smart Mortgage. A true and
     correct copy of the Agreement is attached hereto as Exhibit A.

65.  The December 27, 2018 Loan Officer Retention Agreement increased Klaic's financial
     compensation incentives with Smart Mortgage from the June 1, 2011 Loan Officer
     Retention Agreement.

66.  Klaic received the increased financial compensation for closed loans from December 29,
     2017 until signing the 2020 Loan Officer Retention Agreement.

67.  Smart Mortgage was Klaic's only employer from June 1, 2011 to August 6, 2021.

68.  The December 27, 2018 Agreement does not contain any language terminating the June 1,
     2011 Loan Officer Retention Agreement.

69.  The Agreement contains a number of tailored restrictions on Klaic's post-employment
     activities similar to the June 1, 2011 Agreement.

70. First, Paragraph 16 of the Agreement restricts Klaic's use of confidential information:

> Loan Officer recognizes that Smart has and will have information such as customer names, customer lists, leads, customer files, mortgage loan documentation, and other confidential information regarding Smart's business operations ("Information"). Loan Officer agrees that Loan Officer will not, at any time nor in any manner, either directly or indirectly, use any "Information" for Loan Officer's own benefit, or divulge, disclose, or communicate in any manner any "Information" to any third party, without the prior written consent of Smart. Loan Officer will protect the "Information" and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement and shall entitle Smart to seek injunctive relief as well as damages.

71. Paragraph 16 of the Agreement also restricts Klaic from doing business with

Smart Mortgage customers:

> Loan Officer agrees and acknowledges that he or she shall not do business with any customer of Smart, including those Smart customers that were produced by Loan Officer during the term of the agreement for a period of one (1) year from the date of Loan Officer's termination of employment with Smart. Loan Officer agrees to advise Smart within twenty-four (24) hours of the time of such customer contact in writing if he or she is contacted by a Smart customer, seeking to procure a mortgage loan within the one (1) year period following the Loan Officer's termination of employment with Smart. Loan Officer will take no further action to complete a loan for the Smart customer without the prior written consent of Smart.

## Klaic's Termination and Breach of the Agreement

72. On or about August 6, 2021, Klaic voluntarily terminated his employment with Smart

   Mortgage.

73. Smart Mortgage subsequently discovered that, immediately prior to his departure on

   August 6, 2021, Klaic assessed and misappropriated Smart Mortage's data files.

74. Paul Stretavong, Smart Mortgage's Information Technology Manager, discovered

   Klaic's unauthorized access of Smart Mortgage's client database.

75. Klaic exceeded his authorization as a Smart Mortgage employee when he accessed,

   downloaded, and misappropriated Smart Mortgage's client database for his own

   personal and financial benefit.

76. Smart Mortgage's client database includes unique client names relating to closed loans, denied loans, and archived records not known or available to the general public.

77. Smart Mortgage's client database also includes personal identifying information, historical client transaction information, client preferences, and personalized notes.

78. Klaic misappropriated Smart Mortgage's client database, including unique client names related to closed loans, denied loans, and archived records not known or available to the general public.

79. Klaic misappropriated Smart Mortgage's confidential and trade secret information prior to his departure from Smart Mortgage on August 6, 2021.

80. At no time did Klaic contact Smart Mortgage to notify it that a Smart Mortgage client had contacted him seeking to procure a mortgage loan after he voluntarily terminated his employment with Smart Mortgage on August 6, 2021.

81. Klaic has closed at least one loan with a Smart Mortgage client after he resigned from Smart Mortgage without the prior written consent of Smart Mortgage.

82. Smart Mortgage was Klaic's only employer from June 1, 2011 to August 6, 2021.

83. Klaic received revenues from the confidential client data that he misappropriated from Smart Mortgage.

84. On August 6, 2021, Klaic began his employment with Nexa Mortgage.

85. From August 6, 2021 and continuing to the present, Klaic has solicited and offered mortgage services to an unknown number of individuals from Smart Mortgage's client database.

86. The computer files that Klaic misappropriated contained detailed confidential information and trade secrets relating to Smart Mortgage customers.

87. Klaic continues to use the misappropriated confidential client information and trade secrets

from Smart Mortgage for his own personal benefit and financial benefit by closing loans
with Smart Mortgage customers.

## Klaic's Loan Retention Agreement Non-Disclosure and Non-Solicitation

88. Klaic signed a third agreement with Smart Mortgage in 2020.

89. Klaic's continued employment was conditioned on Klaic's execution of a Loan Officer
Retention Agreement consisting of Non-Disclosure and Non-Solicitation provisions.

90. In 2020, Klaic agreed to be bound by the terms of the 2020 Loan Officer Retention
Agreement, and returned an executed copy of the Agreement to Smart Mortgage.

91. The 2020 Loan Officer Retention Agreement increased Klaic's financial compensation
incentives with Smart Mortgage.

92. Smart Mortgage was Klaic's only employer from June 1, 2011 to August 6, 2021.

93. The 2020 Loan Officer Retention Agreement does not contain any language terminating the
December 27, 2018 agreement.

94. The 2020 Loan Officer Retention Agreement contains a number of tailored restrictions on
Klaic's post-employment activities similar to the December 27, 2018 Agreement.

95. First, Paragraph 16 of the Agreement restricts Klaic's use of confidential information:

> Loan Officer recognizes that Smart has and will have information such as
> customer names, customer lists, leads, customer files, mortgage loan
> documentation, and other confidential information regarding Smart's business
> operations ("Information"). Loan Officer agrees that Loan Officer will not, at any
> time nor in any manner, either directly or indirectly, use any "Information" for
> Loan Officer's own benefit, or divulge, disclose, or communicate in any manner
> any "Information" to any third party, without the prior written consent of Smart.
> Loan Officer will protect the "Information" and treat it as strictly confidential. A
> violation of this paragraph shall be a material violation of this Agreement and
> shall entitle Smart to seek injunctive relief as well as damages.

96. Paragraph 16 of the Agreement also restricts Klaic from doing business with

Smart Mortgage customers:

Loan Officer agrees and acknowledges that he or she shall not do business with any customer of Smart, including those Smart customers that were produced by Loan Officer during the term of the agreement for a period of one (1) year from the date of Loan Officer's termination of employment with Smart. Loan Officer agrees to advise Smart within twenty-four (24) hours of the time of such customer contact in writing if he or she is contacted by a Smart customer, seeking to procure a mortgage loan within the one (1) year period following the Loan Officer's termination of employment with Smart. Loan Officer will take no further action to complete a loan for the Smart customer without the prior written consent of Smart.

**Klaic's Termination and Breach of the Agreement**

97. On or about August 6, 2021, Klaic voluntarily terminated his employment with Smart

Mortgage.

98. Smart Mortgage subsequently discovered that, immediately prior to his departure on

August 6, 2021, Klaic assessed and misappropriated Smart Mortgage's confidential data

files and trade secrets.

99. Paul Stretavong, Smart Mortgage's Information Technology Manager, discovered

Klaic's unauthorized access of Smart Mortgage's client database.

100. Klaic exceeded his authorization as a Smart Mortgage employee when he accessed,

downloaded, and misappropriated Smart Mortgage's client database for his own

personal and financial benefit.

101. Smart Mortgage's client database includes unique client names relating to closed loans,

denied loans, and archived records not known or available to the general public.

102. Smart Mortgage's client database also includes personal identifying information, historical

client information, client preferences, and personalized notes.

103. Klaic misappropriated Smart Mortgage's client database, including unique client names related to closed loans, denied loans, and archived records not known or available to the general public.

104. Klaic misappropriated Smart Mortage's confidential and trade secret information prior to his departure from Smart Mortgage on August 6, 2021.

105. At no time did Klaic contact Smart Mortgage to notify it that a Smart Mortgage client had contacted him seeking to procure a mortgage loan after he voluntarily terminated his employment with Smart Mortgage on August 6, 2021.

106. Klaic has closed at least one loan with a Smart Mortgage client after he resigned from Smart Mortgage without the prior written consent of Smart Mortgage.

107. Smart Mortgage was Klaic's only employer from June 1, 2011 to August 6, 2021.

108. Klaic received revenues from the confidential client data that he misappropriated from Smart Mortgage.

109. On August 6, 2021, Klaic began his employment with Nexa Mortgage.

110. From August 6, 2021 and continuing to the present, Klaic has solicited and offered mortgage services to an unknown number of individuals from Smart Mortgage's client database.

111. The computer files that Klaic misappropriated from Smart Mortgage restricted access client database contained detailed confidential information and trade secrets relating to Smart Mortgage customers.

112. Klaic continues to use the misappropriated confidential client information and trade secrets from Smart Mortgage for his own personal benefit and financial benefit by closing loans with Smart Mortgage customers.

**Financial Harm and Reputation Damage to Smart Mortgage**

113. Smart Mortgage's regularly and routinely enters into loan purchase contracts with several lenders, including but not limited to PRMG, Inc, Home Point Financial Corporation, Union Home Mortgage Corporation, Oaktree Funding Corporation, Carrington Mortgage, Bayview Financial, and Flagstar Bank.

114. The above referenced lenders have a right to review their purchase price for the loan if the borrower refinances the loan within a set period of time.

115. Klaic is actively soliciting Smart Mortgage borrowers who are seeking to refinance their existing loans with Smart Mortgage, thereby interfering with Smart Mortgage's contracts and its prospective advantage with the loan purchasers.

116. Accordingly, Klaic has caused irreparable harm to Smart Mortgage's business reputation and harm to Smart Mortgage's customers because of Klaic's misappropriation of Smart's confidential client information and trade secrets.

## IV.  BASIS OF CLAIMS

117. Defendant Klaic has violated several provisions of his December 27, 2018 Loan Officer Retention Agreement with Smart Mortgage.

118. Klaic has misappropriated Smart Mortgage's client database.

119. Klaic has financially benefited from his continued use of Smart Mortgage's client database, as he has used Smart Mortgage's client database to market and sell mortgages, loan services, and products.

## COUNT I

### TEMPORARY RESTRAINING ORDER AND OTHER INJUNCTIVE RELIEF

120. Smart Mortgage repeats and re-alleges each and every allegation contained in paragraphs 1-119 above as if each were more fully set forth herein.

121.    Smart Mortgage has legitimate interests in its client database, which by virtue of the Defendant's conduct, is in need of immediate protection.

122.    Smart Mortgage will likely succeed on its claims set forth in its Complaint against the Defendant.

123.    Smart Mortgage has suffered and will continue to suffer irreparable harm if Defendant is not enjoined.

124.    There is no adequate remedy at law for the injuries sustained by Smart Mortgage.

## COUNT II

### BREACH OF CONTRACT
### ( December 27, 2018 Loan Officer Retention Agreement)

Smart Mortgage sues Klaic and alleges:

125.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-119 above as if each were more fully set forth herein.

126.    On December 27, 2018, Klaic signed a Loan Officer Retention Agreement with Smart Mortgage. See Exhibit A.

127.    Schedule A specifically outlines Klaic's compensation terms with Smart Mortgage.

128.    The December 27, 2018 Agreement is a valid and enforceable contract.

129.    Klaic entered into the December 27, 2018 Agreement for adequate consideration, including his continuing employment with Smart Mortgage in the State of Illinois.

130.    Smart Mortgage has performed all of its duties and obligations under the December 27, 2018 Agreement.

131.    Klaic has violated the December 27, 2018 Agreement by closing mortgage loans with Smart Mortgage clients with whom he directly worked with at Smart Mortgage during his employment with Smart Mortgage.

132. Klaic has violated the December 27, 2018 Agreement by soliciting and closing a mortgage for at least one Smart Mortgage client.

133. Klaic misappropriated Smart Mortgage's confidential client information prior to his resignation from Smart Mortgage.

134. Klaic has further violated the December 27, 2018 Agreement by retaining, using and disclosing Smart Mortgage's confidential information.

135. Based on Klaic's conduct, unless Klaic is enjoined, he will further violate the December 27, 2018 Agreement by soliciting or selling mortgage products and services to Smart Mortgage's customers and using or disclosing Smart Mortgage's confidential information and trade secrets.

136. A contract is breached when one party fails to meet its obligation under the contract.

137. Klaic has done and is doing business with Smart Mortgage's clients in violation of Paragraph 16 of the December 27, 2018 Loan Retention Agreement.

138. Smart Mortgage has suffered actual and compensatory damages as a result of Defendant Ryan Klaic's breach of the December 27, 2018 Loan Officer Retention Agreement.

139. Specifically, Klaic diverted known Smart Mortgage customers to Nexa Mortgage who ordinarily would have utilized the services of Smart Mortgage for their residential purchases or refinances.

140. Based upon Smart Mortgage customers that Klaic diverted and is continuing to divert to Nexa Mortgage based upon the misappropriated data, Smart Mortgage estimates its actual losses will be in excess of one million dollars if Klaic is not enjoined.

141. Klaic closed a loan with individuals from Smart Mortgage's client database named R.K. and M.T on September 22, 2021 as an employee with Nexa Mortgage.

142. R.K. and M.T. completed their loan application at Smart Mortgage on June 29, 2021.

143. R.K. and M.T.'s mortgage loan was in processing at the time that Klaic resigned on August 6, 2021.

144. On August 11, 2021, Smart Mortgage was alerted to Klaic's steering R.K. and M.T to his new employer Nexa Mortgage, LLC when an individual named Maureen Sullivan copied an email to Klaic to his ryan@smartmtgs.net that he utilized at Smart Mortgage.

145. Smart Mortgage offered R.K. and M.T. an interest rate of 2.25% for their mortgage loan.

146. R.K. and M.T. closed their mortgage loan with Nexa Mortgage, LLC with an interest rate of 2.99% on September 22, 2021.

147. R.K.'s and M.T.'s personal identifying information was included in the computer files that Klaic misappropriated from Smart Mortgage.

148. As a direct and proximate result of Klaic's breaches, Smart Mortgage has suffered and will continue to suffer immediate and irreparable harm, until Klaic is enjoined from such conduct and ordered to comply with his contractual obligations.

149. Smart Mortgage has suffered actual and compensatory damages as a result of Defendant Ryan Klaic's breach of the December 27, 2018 Loan Officer Retention Agreement in the form of lost profits.

## COUNT III

### Interference with Prospective Economic Advantage

Smart Mortgage sues Defendant Ryan Klaic and alleges:

150. Smart Mortgage repeats and re-alleges each and every allegation contained in paragraphs 1-119 above as if each were more fully set forth herein.

151. Smart Mortgage at all times herein relevant had a prospective economic advantage, which contained the probability of future economic benefit to Smart Mortgage in the form of future business with all of the specific individuals contained within its client confidential database.

152. Klaic was at all times herein aware of Smart Mortgage's prospective economic advantage and interfered with those economic benefits by damaging Smart Mortgage's business by using Smart Mortgage's client database/intellectual property to market and sell mortgage loan services and products in violation of three Loan Officer Retention Agreements.

153. Defendant's acts and omissions as herein alleged were done by Klaic with the intent to interfere with Smart Mortgage's prospective advantage as herein alleged, thereby preventing Smart Mortgage from obtaining the benefit of its investment, copyrights, trade secrets, and sweat equity.

154. Klaic accepted and reaped the benefit of Smart Mortgage's trade secrets, client database, and sweat equity without compensating Smart Mortgage.

155. Klaic has been unjustly enriched by Smart Mortgage's confidential information and trade secrets in an amount to be determined at trial.

156. As a direct and proximate result of the actions of the Klaic, Smart Mortgage has suffered monetary damages in an undetermined amount.

## COUNT IV

### UNJUST ENRICHMENT

In the alternative, Plaintiff sues Defendant Ryan Klaic and alleges:

157. Smart Mortgage repeats and re-alleges each and every allegation contained in paragraphs 1-119 above as if each were more fully set forth herein.

158. As a result of Defendant's actions as described above, Klaic has been unjustly enriched at the expense of Smart Mortgage.

159. As a result of Klaic's actions as described above, Smart Mortgage has been deprived of a valuable benefit.

160. Klaic cannot establish any justification for his unjust enrichment at the expense of Smart Mortgage.

161. The actions of Klaic described above have at all times relevant to this action been willful and/or knowing.

### COUNT V

### ILLINOIS TRADE SECRETS ACT (765 ILCS 1065/1 et seq)

Plaintiff sues Defendant Ryan Klaic and alleges:

162. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-119 above as if each were more fully set forth herein.

163. Smart Mortgage's client database cannot be duplicated from any public sources.

164. Klaic would not have any ability to duplicate Smart Mortgage's client database without spending millions of dollars and decades developing a similar database.

165. Smart Mortgage's client database provides it a competitive advantage in the mortgage broker industry because it is able to generate client leads that are exclusive to Smart Mortgage.

166. This ability to generate client leads exclusive to Smart Mortgage loan officers is the linchpin of Smart Mortgage's competitive advantage in the mortgage industry.

167. Smart Mortgage's client database was developed over a twenty-year time period.

168. Smart Mortgage has invested hundreds of thousands of dollars over a twenty-year period to develop its client database.

169.  Smart Mortgage's client database is not available to the general public or its competitors.

170.  Smart Mortgage's client database access is restricted to a limited number of employees.

171.  Smart Mortgage's client database access is password protected.

172.  Smart Mortgage's loan officers are limited to accessing only client data related to files that have been specifically assigned to a particular loan officer.

173.  Each loan officer's computer, loan origination software, and lead management software is password protected.

174.  Smart Mortgage's client database restricts any loan officer from deleting client information.

175.  Smart Mortgage's client database is stored on a secure virtual private network which limits loan officers' access to only their assigned client information.

176.  Smart Mortgage's private network does not allow any employees to download software.

177.  Smart Mortgage requires all of its loan officers to sign Loan Officer Retention Agreements and obligates its loan officers to return all client lists and company property upon leaving the company.

178.  Smart Mortgage's client database was misappropriated by Klaic.

179.  Upon information and belief, Klaic has willfully and maliciously misappropriated Smart Mortgage's client database.

180.  Klaic is currently benefitting financially from his unauthorized use of Smart Mortgage's client database.

181.  As a direct and proximate result of the actions of the Klaic, Smart Mortgage has suffered actual and compensatory damages in a yet to determined amount.

## COUNT VI

### Breach of Fiduciary Duty and Duty of Loyalty

Plaintiff sues Defendant Ryan Klaic and alleges:

182. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-119 above as if each were more fully set forth herein.

183. Klaic was a Loan Officer with Smart Mortgage and as such, owed fiduciary duties to Smart Mortgage, as well as a duty of loyalty.

184. Klaic breached his respective fiduciary duties as well as his respective duties of loyalty to Smart Mortgage by misappropriating Smart Mortgage's confidential information, and by converting and disclosing confidential borrower information to solicit, either directly or indirectly, Smart Mortgage's clients away from Smart Mortgage and toward his new employer Nexa Mortgage.

185. Klaic did not exercise the care required of his position, in that he used his position of trust and confidence to further his own interests, and in so doing caused injury to Smart Mortgage.

186. As a result of Klaic's wrongful conduct, Smart Mortgage has suffered and continues to suffer economic loss and other general and specific damages, including, but not limited to, damage to business reputation, damage to goodwill, lost profits, lost revenue, and lost business opportunities.

187. Klaic committed the wrongful acts alleged herein maliciously, oppressively, and with intent to permanently deprive Smart Mortgage of its property, economic benefits, and its employees.

## COUNT VII

### VIOLATION OF THE DEFEND TRADE SECRETS ACT OF 2016
### 18 U.S.C. § 1836, et seq

Plaintiff sues Defendant Klaic and alleges:

188. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-119 above as if each were more fully set forth herein.

189. Smart Mortgage is a leading mortgage loan broker currently operating in Illinois, Indiana, Colorado, Florida, and Virginia.

190. Smart Mortgage provides mortgage loan solutions to its clients based on their individual preferences and needs.

191. Smart Mortgage provides its clients with access to a diverse range of lenders and financial products.

192. The mortgage loan brokerage business is highly competitive and Smart Mortgage's success depends on numerous factors, including its ability to generate client leads, attract and retain reliable and trustworthy loan originators and support personnel to obtain and maintain Smart Mortgage's client relationships.

193. Smart Mortgage's client database contains unique client names with respect to closed loans, denied loans, and archived records not known or available to the general public.

194. Those archived records include personal identifying information, historical client transaction information, client preferences, and personalized notes.

195. Smart Mortgage's client database is used in or intended for use in interstate commerce as Smart Mortgage operates in Illinois, Indiana, Colorado, Florida, and Virginia.

196. Competitors would gain an immediate and substantial advantage by accessing Smart Mortgage's client database because the competitors would not be required to create an independent solution via its own efforts and expense.

197. Smart Mortgage invests significant financial resources in its business operations to maintain its competitive advantage and expand its client relationships.

198. Smart Mortgage has a number of policies, procedures, and agreements that it uses to protect its trade secret and confidential information, and safeguard its client relationships.

199. Smart Mortgage owns all of the computers used for its business operations.

200. Smart Mortgage does not allow portable data drives or allow employees to create new files to access and remove data from its computer systems.

201. Smart Mortgage prohibits third party software applications such as Dropbox or similar software applications to access or remove data from its computer systems.

202. Smart Mortgage's client database cannot readily be duplicated from any public sources.

203. Klaic would not have any ability to duplicate Smart Mortgage's client database or develop a comparable independent solution without spending millions of dollars and decades developing a similar client database.

204. Smart Mortgage's client database provides it a competitive advantage in the residential mortgage loan brokerage industry because it is able to generate client leads exclusive to Smart Mortgage.

205. Smart Mortgage's client database contains historical client transaction information, client preferences, and personalized notes.

206. This ability to generate client leads exclusive to Smart Mortgage loan officers is the linchpin of Smart Mortgage's competitive advantage in the residential mortgage loan brokerage industry.

207. Smart Mortgage's client database was developed over a twenty-year period.

208. Smart Mortgage has invested hundreds of thousands of dollars over a twenty-year period to develop its client database.

209. Smart Mortgage's client database is not available to the general public or its competitors.

210. Smart Mortgage's client database access is restricted to a limited number of employees.

211. Smart Mortgage's client database access is password protected.

212. Smart Mortgage's loan officers are limited to accessing only client data related to files that have been specifically assigned to that particular loan officer.

213. Each loan officer's computer, loan origination software, lead management software is password protected.

214. Smart Mortgage's client database restricts its loan officers from deleting client information.

215. Smart Mortgage's client database is stored on a secure virtual private network and local private network which limits loan officers' access to only their assigned client files.

216. Smart Mortgage prohibits employees from downloading third-party software on their company issued work computers.

217. Smart Mortgage requires all of its loan officers to sign Loan Officer Retention Agreements and obligates the loan officer to return all client lists and company property upon leaving the company.

218. Smart Mortgage's client database was misappropriated by Klaic.

219. Klaic knew or had reason to know that his misappropriation was acquired through improper means.

220. Klaic solicited clients from Smart Mortgage's client database despite agreeing that he acknowledged and understood that the customers, customer leads, customer files, customer names, and customer mortgage applications and related customer files and documents that he produced for Smart Mortgage during his employment were the sole and exclusive property of Smart Mortgage.

221. Klaic misappropriated customer leads, customer files, customer names, and customer mortgage applications and related customer files and documents from Smart Mortgage at or near the time of his resignation from Smart Mortgage on August 6, 2021.

222. Upon information and belief, Klaic has willfully and maliciously misappropriated Smart Mortgage's client database containing unique client names relating to closed loans, denied loans, and archived records with personal identifying information, historical client transaction information, client preferences, and personalized notes by misappropriating Smart Mortgage's trade secret and confidential information.

223. Smart Mortgage's client database is currently being used by Klaic for his personal and financial benefit.

224. As a direct and proximate result of the actions of Klaic, Smart Mortgage has suffered actual and compensatory damages in an undetermined amount.

225. To protect its business interests and the confidentiality of business operations, Smart Mortgage has taken affirmative measures, including the utilization of restrictive covenants in its employment contracts, requiring employees to use a computer username and protected password, incorporating firewalls to limit access and safeguard information, and restricting unauthorized use of client data.

226. The restrictive covenants in Smart Mortgage's loan retention agreements are negotiated with each employee as part of their employment and include any combination of clauses concerning confidential information.

227. Each restrictive covenant in Smart Mortgage's loan retention agreements is limited in scope to protect both Smart Mortgage's legitimate business interests while preventing undue hardship on the employee in his or her pursuit of employment in his or her area of expertise.

228. Klaic has used and disclosed Smart Mortgage Center's trade secrets and confidential information in violation of federal law.

229. As a condition of employment, Ryan Klaic signed three employment agreements with Smart Mortgage.

230. The employment agreements signed by Klaic and Smart Mortgage contained several restrictive covenants, including clauses related to confidential information.

231. As a loan officer at Smart Mortgage, Klaic's duties to Smart Mortgage Centers included but were not limited to: (i) performing to the best of his abilities all duties assigned to him by Smart Mortgage and to carry out all Smart Mortgage's policies and directives as described in the Loan Officer Retention Agreements; (ii) to fully comply with all state and federal laws, rules and regulations regarding the origination and processing of mortgage loans, (iii) to perform to the best of his abilities said duties in compliance with all Acts and regulations affecting the residential mortgage industry, and (iv) to not use any confidential information regarding Smart Mortgage's business operations for his own benefit, or divulge, disclose, or communicate this information to any third party, without the prior written consent of Smart Mortgage.

232. In the restrictive covenants in his employment agreements, including those concerning confidential information, Defendant Ryan Klaic agreed that Smart Mortgage's customers, customer leads, customer files, customer names, and customer mortgage applications and related customer files and documents that he produced for Smart Mortgage during his employment were the sole and exclusive property of Smart Mortgage.

233. Defendant Ryan Klaic agreed that he would follow this and other restrictive covenants regarding Smart Mortgage's trade secrets and confidential business information during his

employment with Smart Mortgage Centers and for as long as the confidentiality of trade secrets and proprietary business information were to be maintained under applicable law.

234. Klaic's agreement to abide by the restrictive covenants were supported by adequate consideration, which consisted of his accepting and continuing his employment and compensation increases.

235. The restrictive covenants in his employment agreements were fair, reasonable, and necessary for the protection of Smart Mortgage's legitimate business interests.

236. During his employment with Smart Mortgage, Klaic had access to all of Smart Mortgage's trade secrets and confidential business information via his company issued work computers and Smart Mortgage's virtual private network.

237. Klaic's company issued work computer was user and password protected, as well as protected by other measures, including a firewall.

238. Klaic accessed, copied, and misappropriated Smart Mortgage's client database prior to his resignation date of August 6, 2021.

239. Defendant Ryan Klaic is currently using Smart Mortgage's client database to solicit clients while employed with Nexa Mortgage.

240. Klaic unlawfully disclosed Smart Mortgage's trade secrets that he had wrongfully copied and misappropriated from Smart Mortgage's virtual private network.

241. Klaic left Smart Mortgage Centers for employment in a similar position with Nexa Mortgage on August 6, 2021.

242. Under these circumstances, given Klaic's prior employment with Smart Mortgage and his wrongful copying of Smart Mortgage's trade secrets, Klaic's use of Smart Mortgage's trade secrets is evident in Klaic's closed transaction with Nexa Mortagage and can also be inferred under the "inevitable disclosure doctrine".

243. The Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., which was passed into law on May 11, 2016, specifically allows a private right of action for misappropriation of trade secrets.

244. Smart Mortgage is an owner of trade secrets, as defined by the Defend Trade Secrets Act which have been willfully misappropriated by Klaic. A person misappropriates a trade secret by, among other things, disclosing the trade secret despite knowing that it was acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use or from a person who had a duty to maintain its secrecy or use.

245. Smart Mortgage took affirmative measures to keep its confidential and proprietary information secret.

246. Defendant Ryan Klaic signed multiple employment agreements with Smart Mortgage that included restrictive covenants concerning confidential information.

247. Klaic's online activity on Smart Mortgage's virtual private network showed activity in which Smart Mortgage's proprietary trade secret data and files were accessed and misappropriated on or before August 6, 2021.

248. Smart Mortgage has no adequate remedy at law to protect against the illegal misappropriation and use of its trade secrets by Klaic. Injunctive relief is, therefore, necessary and appropriate to restrain the illegal misappropriation and use of such trade secrets and confidential information pursuant to the Defend Trade Secrets Act.

249. Unless Klaic is restrained and enjoined from using Smart Mortgage's trade secrets and confidential information, Smart Mortgage Centers will suffer immediate and irreparable injury in that Klaic will continue to have access and the ability to make use of Smart Mortgage's trade secrets and confidential information.

250. As a direct and proximate result of Klaic's actual and threatened misappropriation of

Smart Mortgage's trade secrets and confidential information, Smart Mortgage has suffered damages in an amount yet to be determined. Klaic has been unjustly enriched. Pursuant to the Defend Trade Secrets Act, Smart Mortgage is entitled to recover damages. By reason of Klaic's willful and malicious acts, Smart Mortgage is entitled to an award of exemplary damages from Klaic in such amounts as is necessary to punish Klaic and deter him from commission of like acts and, in addition, reasonable attorneys' fees pursuant to the Defend Trade Secrets Act.

## COUNT VIII

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030**

Plaintiff sues Klaic and alleges:

251. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-119 above as if each were more fully set forth herein.

252. Klaic was issued a Smart Mortgage computer that was used in interstate commerce and constitutes a "protected computer" under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(e)(2)(b).

253. Without authorization or by exceeding authorized access, Klaic intentionally accessed his Smart Mortgage-issued computing device and/or the Smart Mortgage network/email systems with the intent to defraud Smart Mortgage in violation of Sections 1030(a)(2)(c), (a)(4) and (a)(5) of the CFAA, including by:

(a) obtaining certain information from the Smart Mortgage-issued computing device and/or the Smart Mortgage network;

(b) obtaining copies of certain documents and files of value from the Smart Mortgage-issued computing device and/or the Smart Mortgage network;

(c) and deleting electronic files from the Smart Mortgage-issued computing device

and/or the Smart Mortgage network.

254. By engaging in the foregoing misconduct for the purpose of misappropriating Smart Mortgage's confidential information and trade secrets, Klaic breached his fiduciary duties and other obligations owed to Smart Mortgage.

255. Klaic had no authority or authorization for the foregoing misconduct.

256. Defendant Klaic intentionally and recklessly caused damage and loss to Smart Mortgage in excess of $5,000 because his conduct impaired the integrity of Smart Mortgage's private virtual network and required Smart Mortgage to expend resources to investigate the foregoing misconduct, conduct forensic examination of Klaic's data activity to ascertain the scope of Klaic's misconduct, and perform certain remedial measures required as a result of such misconduct.

257. As a further direct and proximate cause of the foregoing misconduct, Smart Mortgage has been damaged and suffered loss in an amount in excess of $5,000 to the extent that Klaic accessed, deleted, destroyed and copied electronic files containing confidential information and trade secrets belonging to Smart Mortgage for his personal use and/or financial benefit.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Smart Mortgage prays that judgment be entered as follows:

On Plaintiff' Count One for Temporary Restraining Order and Other Injunctive Relief

A. Temporarily restraining, and preliminarily and permanently enjoining Defendant, and anyone acting in concert with him or at his direction, from using the Plaintiff's client database and/or information to aid Defendant's current employer or any other business.

B. Temporarily restraining, and preliminarily and permanently enjoining Defendant, and anyone acting in concert with him or at his direction, from soliciting, diverting, or providing services to Plaintiff's clients any competing enterprise; and

C. Granting such other relief and further relief as the Court deems just and equitable.

On Plaintiff's Count Two for Breach of Contract of the December 27, 2018 Agreement against Defendant.

A) Compensatory Damages in the amount of $1,000,000.00

On Plaintiff's Count Three for Interference with Prospective Economic Advantage against Defendant.

A) Compensatory Damages in the amount of $1,000,000.00

On Plaintiff's Count Four for Unjust Enrichment against Defendant:

A) Compensatory Damages in the amount of $1,000,000.00

On Plaintiff's Count Five for Violation of the Illinois Trade Secrets Act:

A) Enjoining Defendant's misappropriation pursuant to 765 ILCS 1065/3

B) Compensatory Damages in the amount of $1,000,000.00

C) Exemplary damages in an amount twice the award of any compensatory damages awarded to Smart Mortgage.

D) Reasonable attorney fees pursuant to 765 ILCS 1065/6

On Plaintiff's Count Six for Breach of Fiduciary Duty and Duty of Loyalty against Defendant:

A) Compensatory Damages in the amount of $1,000,000.00

On Plaintiff's Count Seven for Violation of the Defend Trade Secrets Act

A) Enjoining Defendant's misappropriation pursuant to § 1836(b)(3)(A)

B) Compensatory Damages in an amount to be determined pursuant to § 1836(b)(3)(B)(i) or

§ 1836(b)(3)(B)(ii).

C) Exemplary damages in an amount twice the award of any compensatory damages awarded to Smart Mortgage pursuant to § 1836(b)(3)(C).

D) Reasonable attorney fees pursuant to § 1836(b)(3)(D).

On Plaintiff's Count Eight for Violation of the Computer Fraud and Abuse Act

A) the issuance of temporary, preliminary and permanent injunctive relief enjoining Defendant and every person and entity acting in concert with him, from directly or indirectly misappropriating, disclosing and/or using Smart Mortgage's confidential information and trade secrets;

B) the issuance of a mandatory injunction compelling Defendant and every person and entity acting in concert with him, including, but not limited to his current employer or future employer, Defendant returning all documents and other materials containing or constituting Smart Mortgage's confidential information and trade secrets, Defendant allowing the immediate inspection of all electronic devices including but not limited to his smartphone, computers, tablets, and any other electronic devices by Plaintiff's forensic expert;

C) the award of compensatory damages in an amount to be determined at trial pursuant to 18 U.S.C. § 1030(g)

On all counts, costs and expenses incurred in this action and any further relief as the jury and Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 14, 2021

For the Plaintiff

Smart Mortgage Centers, Inc.

By its attorney,
/s/ Wilton A. Person

_____

Wilton A. Person

DuPage County Attorney #222371
Wilton A. Person
Attorney for the Plaintiff
24330 Leski Lane
Plainfield, Illinois 60585
(815) 254-2467
wperson@personlaw.com

## VERIFICATION BY CERTIFICATION

Under the penalties as provided by law pursuant to paragraph 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Richard Birk, President
SMART MORTGAGE CENTERS, INC.

## LOAN OFFICER RETENTION AGREEMENT

This Loan Officer Retention Agreement (the "Agreement") establishing an employment relationship between **Smart Mortgage Centers, Inc.**, an Illinois Corporation ("Smart") and _RYAN KLAIC_ (the "Loan Officer"), is dated as of this _27TH_ day of _DECEMBER_, 2018.

WHEREAS, Smart is a licensee pursuant to the Illinois Residential Mortgage License Act of 1987 (the "Act") operating from its corporate offices at 4003 Plainfield/Naperville Rd., Suite 207, Naperville, Illinois 60564 (the "Home Office").

WHEREAS, Loan Officer has represented to Smart that he or she has experience and knowledge in the origination of residential mortgages;

WHEREAS, Smart seeks to employ Loan Officer for the purpose of assisting Smart in the performance of activities by the Act, including the origination of residential mortgage loans ("Loans"); and

WHEREAS, Loan Officer is willing to become an employee of Smart for the purpose of assisting Smart in the origination of residential mortgage loans;

NOW, THEREFORE, in consideration of the mutual covenants, herein contained, the sufficiency of which is acknowledged, it is agreed as follows:

1. APPLICATIONS: Loan Officer shall take all Mortgage Loan applications in the name of Smart and on behalf of Smart, including all mandatory application and disclosure forms required by Smart, the Act, or pursuant to other regulatory, legal or lender requirements. Loan Officer acknowledges and understands that the customers, customer leads, customer files, customer names and customer mortgage applications and the related customer files and documents that he or she produces for Smart during his or her employment with Smart belong to and are the sole and exclusive property of Smart Mortgage Centers, Inc. and these items are not the property of the Loan Officer. Initial here: _(RK)_

2. REPRESENTATIONS: (i) Loan Officer represents that he/she has read and has full knowledge of the Act, the other state and federal regulations affecting the residential mortgage industry ("Regulations") and agrees to operate fully within their purview, including but not limited to assisting _only_ Smart in the performance of mortgage loan origination activities regulated by the Act and the Regulations; (ii) Loan Officer represents that he or she shall not enter into contracts (which relate in any way to this Agreement) with any person or entity without prior written consent of Smart; and (iii) Loan Officer shall act exclusively as a Loan Officer for Smart and shall not be affiliated with any other mortgage banker, broker or other lender, without the prior written consent of Smart.

Exhibit A

3.  (a)  **RESPONSIBILITIES AND DUTIES:**  Loan Officer hereby accepts the following responsibilities and duties:

- a.  To perform to the best of his/her ability all duties assigned to him her by Smart and to carry out all Smart's policies and directives as described herein or as otherwise communicated to Loan Officer from time to time.
- b.  To perform to the best of his/her ability said duties in compliance with the Act, Regulations and all other applicable laws.
- c.  To fully comply with all state and federal laws, rules and regulations regarding the origination and processing of mortgage Loans.
- d.  To not become involved in any personal or business matter which may adversely affect or reflect upon Smart.
- e.  To attend all meetings, including Company policy and education meetings when required by Smart.
- f.  To <u>not</u> engage in any form of fraud or other illegal activity regarding the origination and processing of Loans, including Loan Officer's agreement not to mislead prospective customers or otherwise induce customers to commit fraud in the loan origination process.
- g.  To immediately lock in loan rates and terms at the customer directions.
- h.  To comply with all licensure and certification requirements mandated by applicable state or federal laws, at the expense of Loan Officer.
- i.  Loan Officer agrees and understands and agrees and understands that he or she is employed as an outside sales employee (see Schedule B).
- j.  "Counseling Services"
   - i. Educating the Borrower in the home buying and financing process, advising the Borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product.
   - ii.  Collecting financial information (tax returns, bank statement, etc.) and other related documents that are part of the application process.
   - iii.  Maintaining regular contact with the Borrower, Realtors, and Lenders between application and closing to apprise all parties of the status of the application and to gather any additional information as needed.
- k.  To perform all of the above duties on a professional basis and to interact with all Smart staff with professionalism and courtesy.

4.  **TERMS OF AGREEMENT:** This agreement shall remain in effect on a continuous basis from the date of this Agreement, unless terminated in accordance with the termination provisions hereinafter set forth.

5.  **TERMINATION:** This Agreement may be terminated: (1) without cause by thirty (30) days prior written notice by either party; (ii) immediately with cause upon a material breach of any term of this Agreement by either of the parties upon notice to the other party; (iii)

immediately upon Loan Officer's violation of any provisions of the Act or other laws or regulations. Upon such termination, Smart shall continue to process all mortgage loan applications taken by the Loan Officer for Smart through the date of such termination. Cause shall exist to immediately terminate this Agreement upon the Loan Officer's breach of the provisions of Paragraph Nine (9) hereof or any other breach of the terms hereof or of the policies of Smart, any of which breach(s) shall be considered a material breach of this Agreement. Loan Officer acknowledges that all customers, borrowers, Mortgage Loans originated, and all documentation generated in the name of Smart are the sole and exclusive property of Smart, and Loan Officer agrees not to make any claim for any ownership interest in either the customers, Mortgage Loans, leads purchased or generated by Smart, customer loan files and/or the related documentation that he or she produced while employed by Smart. Loan Officer agrees that he/she shall <u>not</u> remove or withdraw any mortgage loan application(s) submitted by Smart to a mortgage banker/broker, and resubmit said loan(s) to another mortgage banker/broker, without the prior written consent of Smart.

6.  (b)  **DESCRIPTION OF FINANCIAL SERVICES:** Loan Officer will provide the following services:

a.  Loan Officer agrees and understands that his or her duties include various services for Smart, such as collecting and analyzing information and data regarding all customer's income, assets, investments, or debts; determining and assessing which mortgage loan products best meet the customer's needs and financial considerations; advising the customer about the advantages and disadvantages of various mortgage loan products that the customer may qualify for; and marketing, servicing and promoting mortgage loan products made available through Smart from time to time;

b.  Provide customary assistance in connection with the processing of Mortgage Loan applications for Smart;

c.  Send Mortgage Loan applications for underwriting approval only to investors with whom Smart has entered into Correspondent Agreements (the "Investors");

d.  Arrange and attend, if necessary the closing of said Mortgage Loans; and collect all monies due and owing to Smart, made payable only to Smart, and for deposit only by Smart, as a result of each completed Mortgage Loan transaction.

e.  Educating the Borrower in the home buying and financing process, advising the Borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product.

f.  Assisting the Borrower in understanding and clearing credit problems.

7.  **DEPOSIT OF FUNDS:** All funds or drafts received by Loan Officer during his employment at Smart, such as application deposits, appraisal fees, credit reporting fees, title charges, etc., shall be made payable only to Smart and shall immediately be delivered to Smart, to be deposited into Smart's "Operations Account" with documentation as to the source, use and disposition of said funds. To the extent reasonably feasible, the documentation submitted to Smart with each draft or check shall identify in writing the name of Smart's borrower(s). Loan

Officer acknowledges that he/she shall be responsible for the collection of all fees in connection with mortgage Loans originated by Loan Officer, and, if not so collected by Loan Officer from Borrower at the time of Loan closing, then Smart shall have the right to set off and deduct from any amounts due Loan Officer hereunder any amounts not paid, including but not limited to the above, and any shortages created by improperly processing said mortgage Loans; unpaid amounts due Smart; bounced Borrower(s) checks; any and all legal fees and costs relating to such matters; lender premium repayments for loans originated in violation of a lender's correspondent agreement with Smart and other items due Smart or third parties relating to Loan Officer, his or her Borrower(s) or otherwise.

All commission or other checks generated by closed Mortgage Loan transactions must be made payable to "**Smart Mortgage Centers, Inc.**", delivered to the Home Office, for deposit only by Smart into its "Operating Account", for allocation and payment by Smart. If Loan Officer deposits any above-described commission or other check(s) into an account that is controlled by Loan Officer or another person, and not by Smart, then such Loan Officer action shall constitute an immediate breach and termination of this Agreement, shall subject the Loan Officer to forfeiture of any and all amounts due Loan Officer hereunder, to immediate payment to Smart of any outstanding bills and invoices generated by Loan Officer; possible criminal investigation and civil action and fines.

8.      **COMPENSATION MATTERS:** Smart agrees to make payments to Loan Officer in accordance with Schedule A attached hereto and incorporated by reference into this Agreement. Loan Officer agrees to make payments to Smart in accordance with the terms hereof. Loan Officer represents and warrants to Smart that if Loan officer is not entitled to a paycheck for any pay period that he did not render any services to Smart during that period. Smart reserves the right to change the pay structure, see Schedule A, by giving the Loan Officer written notice of thirty (30) days.

9.      **EXCLUSIVITY:** Loan Officer agrees that he/she shall not be affiliated with or otherwise perform any licensable services for: (i) any other licensee under the Act; or (ii) any other entity exempt from licensure under the Act; or (iii) any other entity that is required to become licensed under the Act but is not so licensed while this Agreement is in effect. Any breach of the provisions of this Paragraph Nine (9) shall be considered a material breach of this Agreement and shall be grounds for immediate termination of this Agreement.

10.     **ADVERTISING:** All advertising proposed for use by Loan Officer must be pre-approved by Smart prior to its use. Advertising shall be deemed to include, but not limited to, advertisements in newspapers, magazines, other periodicals, radio spots, television commercials, computer bulletin boards and the Internet (a/k/a The World Wide Web), mailing pieces, business cards, etc. Smart shall approve or reject said advertising in a timely manner. All such advertising shall be on behalf of Smart and shall comply with applicable provisions of the Act and the Regulations. Advertising may include the name of the Loan Officer as an employee of Smart.

Officer acknowledges that he/she shall be responsible for the collection of all fees in connection with mortgage Loans originated by Loan Officer, and, if not so collected by Loan Officer from Borrower at the time of Loan closing, then Smart shall have the right to set off and deduct from any amounts due Loan Officer hereunder any amounts not paid, including but not limited to the above, and any shortages created by improperly processing said mortgage Loans; unpaid amounts due Smart; bounced Borrower(s) checks; any and all legal fees and costs relating to such matters; lender premium repayments for loans originated in violation of a lender's correspondent agreement with Smart and other items due Smart or third parties relating to Loan Officer, his or her Borrower(s) or otherwise.

All commission or other checks generated by closed Mortgage Loan transactions must be made payable to **"Smart Mortgage Centers, Inc."**, delivered to the Home Office, for deposit only by Smart into its "Operating Account", for allocation and payment by Smart. If Loan Officer deposits any above-described commission or other check(s) into an account that is controlled by Loan Officer or another person, and not by Smart, then such Loan Officer action shall constitute an immediate breach and termination of this Agreement, shall subject the Loan Officer to forfeiture of any and all amounts due Loan Officer hereunder, to immediate payment to Smart of any outstanding bills and invoices generated by Loan Officer; possible criminal investigation and civil action and fines.

8.      **COMPENSATION MATTERS:** Smart agrees to make payments to Loan Officer in accordance with Schedule A attached hereto and incorporated by reference into this Agreement. Loan Officer agrees to make payments to Smart in accordance with the terms hereof. Loan Officer represents and warrants to Smart that if Loan officer is not entitled to a paycheck for any pay period that he did not render any services to Smart during that period. Smart reserves the right to change the pay structure, see Schedule A, by giving the Loan Officer written notice of thirty (30) days.

9.      **EXCLUSIVITY:** Loan Officer agrees that he/she shall not be affiliated with or otherwise perform any licensable services for: (i) any other licensee under the Act; or (ii) any other entity exempt from licensure under the Act; or (iii) any other entity that is required to become licensed under the Act but is not so licensed while this Agreement is in effect. Any breach of the provisions of this Paragraph Nine (9) shall be considered a material breach of this Agreement and shall be grounds for immediate termination of this Agreement.

10.     **ADVERTISING:** All advertising proposed for use by Loan Officer must be pre-approved by Smart prior to its use. Advertising shall be deemed to include, but not limited to, advertisements in newspapers, magazines, other periodicals, radio spots, television commercials, computer bulletin boards and the Internet (a/k/a The World Wide Web), mailing pieces, business cards, etc. Smart shall approve or reject said advertising in a timely manner. All such advertising shall be on behalf of Smart and shall comply with applicable provisions of the Act and the Regulations. Advertising may include the name of the Loan Officer as an employee of Smart.

11.  **MUTUAL OBLIGATIONS OF LOAN OFFICER AND SMART:** (i) Except for matters relating to mortgage loan originations for Smart consumers, Loan Officer does not have the authority to bind Smart contractually without the prior written consent of Smart; (ii) Loan Officer must utilize appraisers, credit reporting companies, title insurance companies and flood certification companies and other vendors approved by Smart or its correspondent lenders; and (iii) Loan Officer must submit to Smart's Processing Department all new mortgage loan applications on a daily basis within 24 hours of receipt.

12.  **HOLDBACK AND PAYMENT OF FUNDS UPON TERMINATION:** In the event this Agreement is terminated in accordance with the terms hereof, Smart shall have the right to withhold payment of any and all amounts due to Loan Officer for a period not to exceed sixty (60) days to ensure that all outstanding bills owed to Smart, to third-party vendors of Smart or otherwise; have been paid in full. If it is discovered that any obligation of the Loan Officer has not been paid which directly relates to a Mortgage Loan being processed or obligations owed to Smart, then, in that event, Smart shall pay such obligation on behalf of the Loan Officer: (i) first, from the funds withheld from Loan Officer, and (ii) in the event that such funds are insufficient, then, at Smart's election, from Smart with reimbursement by Loan Officer to Smart. Loan Officer agrees and understands that he or she shall not be entitled to the compensation set forth on Schedule A (Pay Plan) in the event of Loan Officer's voluntary termination of employment; and Loan Officer agrees that he or she not be entitled to any further compensation from Smart if Loan Officer's employment is terminated for cause because Loan Officer engaged in any type or form of fraud in the loan settlement process; or otherwise breached the terms of this Agreement. In the event of an employee fine due to not following State and or Federal audit procedures: Money owed will be held until each late transaction withheld is cleared by State and or Federal Regulator's. In some cases this can be every audit period (3 – 5 years). In the event this agreement is terminated during this time fines will not be reimbursed.

13.  **DELIVERY OF DOCUMENTATION:** Loan Officer agrees that upon entering into a Loan Brokerage Agreement (as defined in the Act) with a Borrower on behalf of Smart, Loan Officer shall immediately supply Smart with the originally signed copy of such agreement(s). Loan Officer further agrees that all pertinent data for each Mortgage Loan file produced for Smart shall be delivered to the Home Office of Smart within 24 hours of Loan Officer's receipt of same. Smart shall maintain said files in or under the control of the Home Office and these files may be made available for review by Loan Officer during regular business hours. Upon termination, it is the responsibility of the Loan Officer to deliver the keys to the Home Office by close of business that day. If not done, Loan Officer will be charged for the locks to be changed.

14.  **COMMISSIONER'S EXAMINATIONS:** Loan Officer acknowledges that Smart may be examined by the IDFPR, Office of Banks and Real Estate under the Act, FHA and/or Smart's independent auditors. Loan Officer agrees to cooperate fully with any and all such examinations and audits.

11.   **MUTUAL OBLIGATIONS OF LOAN OFFICER AND SMART:** (i) Except for matters relating to mortgage loan originations for Smart consumers, Loan Officer does not have the authority to bind Smart contractually without the prior written consent of Smart; (ii) Loan Officer must utilize appraisers, credit reporting companies, title insurance companies and flood certification companies and other vendors approved by Smart or its correspondent lenders; and (iii) Loan Officer must submit to Smart's Processing Department all new mortgage loan applications on a daily basis within 24 hours of receipt.

12.   **HOLDBACK AND PAYMENT OF FUNDS UPON TERMINATION:** In the event this Agreement is terminated in accordance with the terms hereof, Smart shall have the right to withhold payment of any and all amounts due to Loan Officer for a period not to exceed sixty (60) days to ensure that all outstanding bills owed to Smart, to third-party vendors of Smart or otherwise; have been paid in full. If it is discovered that any obligation of the Loan Officer has not been paid which directly relates to a Mortgage Loan being processed or obligations owed to Smart, then, in that event, Smart shall pay such obligation on behalf of the Loan Officer: (i) first, from the funds withheld from Loan Officer, and (ii) in the event that such funds are insufficient, then, at Smart's election, from Smart with reimbursement by Loan Officer to Smart. Loan Officer agrees and understands that he or she shall not be entitled to the compensation set forth on Schedule A (Pay Plan) in the event of Loan Officer's voluntary termination of employment; and Loan Officer agrees that he or she not be entitled to any further compensation from Smart if Loan Officer's employment is terminated for cause because Loan Officer engaged in any type or form of fraud in the loan settlement process; or otherwise breached the terms of this Agreement. In the event of an employee fine due to not following State and or Federal audit procedures: Money owed will be held until each late transaction withheld is cleared by State and or Federal Regulator's. In some cases this can be every audit period (3 – 5 years). In the event this agreement is terminated during this time fines will not be reimbursed.

13.   **DELIVERY OF DOCUMENTATION:** Loan Officer agrees that upon entering into a Loan Brokerage Agreement (as defined in the Act) with a Borrower on behalf of Smart, Loan Officer shall immediately supply Smart with the originally signed copy of such agreement(s). Loan Officer further agrees that all pertinent data for each Mortgage Loan file produced for Smart shall be delivered to the Home Office of Smart within 24 hours of Loan Officer's receipt of same. Smart shall maintain said files in or under the control of the Home Office and these files may be made available for review by Loan Officer during regular business hours. Upon termination, it is the responsibility of the Loan Officer to deliver the keys to the Home Office by close of business that day. If not done, Loan Officer will be charged for the locks to be changed.

14.   **COMMISSIONER'S EXAMINATIONS:** Loan Officer acknowledges that Smart may be examined by the IDFPR, Office of Banks and Real Estate under the Act, FHA and/or Smart's independent auditors. Loan Officer agrees to cooperate fully with any and all such examinations and audits.

15. **INDEMNIFICATION:** Loan Officer acknowledges that he/she is an agent of Smart, and accordingly, Smart may be accountable for certain acts or omissions of the Loan Officer occurring within the scope of the Loan Officer's authority under this Agreement. Smart may be liable to Borrowers of Smart, Investors and to certain third party vendors used by Loan Officer as a result of mortgage origination activities of Loan Officer. It is acknowledged by Loan Officer that Smart may be responsible for the acts of Loan Officer that are performed within the course of his/her duties and responsibilities, and Loan Officer hereby indemnifies, holds harmless and shall defend Smart and its officers, directors, shareholders, employees, agents and attorneys from any and all claims or demands of any kind regarding Loan Officer's alleged breach of the terms of this Agreement; any claims by any third party alleging a breach of covenants not to compete or otherwise; or any other matter. Loan Officer shall pay all legal fees, court costs, fines, penalties or other charges (e.g. filing fees, expert witness fees, etc.) relating to any litigation or other proceeding initiated by either a Borrower(s), lender, investor or any regulatory agency regarding Smart and/or Loan Officer, as shall be determined in the sole discretion of Smart.

In addition to any other remedies that the Lender may have, Loan Officer shall indemnify and hold Lender, its stockholders, affiliates and their respective officers, directors, employees and agents, harmless from and against, and shall reimburse it or them for, any losses, damages, deficiencies, claims, causes, of action or expenses of any nature (including reasonable attorney's fees) incurred at any time arising out of, in connection with or resulting from:

(a) Any misrepresentation made by Loan Officer, or in any schedule, exhibit, report, statement or certificate furnished by Loan Officer pursuant to this Agreement;

(b) The non-fulfillment or non-performance of any covenant, condition or action required of Loan Officer pursuant to this Agreement; or

(c) Any fraud in the preparation or delivery of any mortgage loan application file, known to Loan Officer or Broker, representative or agent of Broker.

(d) Loan Officer understands Smart has agreements with all Lenders that could have early payoff requirements. Loan Officer agrees not to solicit a Borrower for financing if a customer's loan was last financed with Smart and has a specified period of time that a Lender will ask for a yield spread premium to be refunded. Loan Officer agrees if this situation occurs that the Loan Officer will bring it to the attention of an Officer of Smart. If Loan Officer does finance a customer that Loan Officer will be responsible and liable to reimburse Smart for all costs and can be subject to termination.

16. **CONFIDENTIALITY:** Loan Officer recognizes that Smart has and will have information such as customer names, customer lists, leads, customer files, mortgage loan documentation, and other confidential information regarding Smart's business operations ("Information"). Loan Officer agrees that Loan Officer will not, at any time nor in any manner, either directly or indirectly, use any "Information" for Loan Officer's own benefit, or divulge, disclose, or communicate in any manner any "Information" to any third party, without the prior written consent of Smart. Loan Officer will protect the "Information" and treat it as strictly

confidential. A violation of this paragraph shall be a material violation of this Agreement and shall entitle Smart to seek injunctive relief as well as damages.

Loan Officer agrees and acknowledges that he or she shall <u>not</u> do business with any customer of Smart, including those Smart customers that were produced by Loan Officer during the term of the agreement for a period of one (1) year from the date of Loan Officer's termination of employment with Smart. Loan Officer agrees to advise Smart within twenty-four (24) hours of the time of such customer contact in writing if he or she is contacted by a Smart customer, seeking to procure a mortgage loan within the one (1) year period following the Loan Officer's termination of employment with Smart. Loan Officer will take no further action to complete a loan for the Smart customer without the prior written consent of Smart.

If it appears that Loan Officer has disclosed or has threatened to disclose "Information" in violation of this Agreement, Smart shall be entitled to an injunction to restrain Loan Officer from disclosing, in whole or in part, such "Information", or from providing any services to any party to whom such "Information" has been disclosed or may be disclosed. Smart shall not be prohibited by this provision from pursuing any and all other remedies, including a claim for other losses and damages from Loan Officer.

This provision shall remain in full force and effect for a period of one (1) year after the termination of this Agreement.

17.    RETURN OF RECORDS AND PROPERTY: Upon termination of the Loan Officer's employment with Smart, Loan Officer, within twenty-four (24) hours, shall immediately deliver all customer names, customer files, records, notes, door keys, data (i.e. computer processing data) in his/her possession, or under Loan Officer's control that are Smart's property or relate to Smart's business.

18.    EARLY LOAN PAYOFFS: Loan Officer agrees that agreements are in place with Lenders, and if a loan pays off early with a Lender, even if that Loan Officer is not part of the pay-off, that the Loan Officer's commission will be collected and sent back to the Lender. Loan Officer agrees to check with Smart Mortgage Centers, Inc. on the policy for each Lender before soliciting the loan for refinancing or putting a customer in a loan knowing that the customer will pay off the loan in a specified period of time.

19.    MISCELLANEOUS:
    (a)    AMENDMENT: Neither this Agreement nor any term hereof may be amended, waived, discharged orally, but only by instrument in writing signed by each of the parties.
    (b)    HEADINGS: The headings in this Agreement are for convenience or reference only and shall not define or limit the provisions hereof.
    (c)    APPLICABLE LAW: This Agreement shall be construed in accordance with and governed by the Laws of the State of Illinois.

(d)     COUNTERPARTS: This Agreement may be executed in several counterparts, each of which shall constitute an original, but all of which together shall constitute but one instrument.

(e)     JURISDICTION OF COURTS: Any judicial proceedings between the parties under this Agreement shall be brought in the Circuit court of Dupage, Will or Cook County, Illinois.

(f)     PARTIES IN INTEREST: All of the terms, covenants, and conditions herein contained shall inure to the benefit of and the binding upon the parties hereto, their heirs, successors and assigns.

(g)     NOTICES: Notices under this Agreement shall be in writing and be personally delivered or sent by certified or registered mail, return receipt requested, to the parties at their addresses specified below or at such address designated in writing to all pursuant to this paragraph.

(h)     SMART reserves the right to revise commissions, processing fees, insurance fees and other matters upon fifteen (15) days prior written notice to Loan Officer.

(i)     DISPUTES: Loan Officer agrees that any disputes of the Loan Officer arising under this Agreement shall be handled through arbitration at the election of Smart. Loan Officer agrees that no litigation, suit or other proceeding shall be filed against Smart until such arbitration is concluded in all respects.

(j)     EMPLOYEE CONTACT:  Loan Officer shall not solicit, hire or otherwise induce any employee or consultant of Smart to terminate its employment or consulting relationship with Smart.  Loan Officer understands and agrees that it is difficult to compute the damages that Smart may incur if Loan Officer solicits, hires or otherwise induces an employee to terminate his or her employment with Smart.  Loan Officer agrees that this liquidated damages clause is reasonable and does not constitute a penalty. Loan Officer agrees that any violation of this provision shall subject Loan Officer to liquidated damages of $50,000 payable to Smart for each person who leaves Smart to either work for or become employed by the terminated Loan Officer or an entity associated with employs the terminated Loan Officer.  Loan Officer agrees that the liquidated damages of $50,000 are not a penalty and reasonably approximate the cost to recruit, train, and reimburse Smart Mortgage Centers, Inc. for the loss of each person's services to Smart.

(k)     INTRODUCTORY PERIOD: Your first sixty (60) days of employment at Smart is considered an Introductory Period, and during that period you will not accrue benefits available from the company, unless otherwise required by law, or unless otherwise provided in the applicable benefit plan document.  This Introductory Period will be a time for getting to know your fellow employees, your manager/supervisor and the tasks involved in your job position, as well as becoming familiar with Smart's business.

        This Introductory Period is a try-out time for both of you, as an employee, and Smart, as an employer.  During this Introductory Period, Smart will evaluate your suitability for employment, and you can evaluate Smart as well.  At any time during this

first sixty (60) days, you may resign without any detriment to your record. If during this period, your work habits, attitude, attendance or performance do not measure up to our standards, we may discharge you. If you take approved time off during the Introductory Period, the Introductory Period may be extended by that length of time.

At the end of the Introductory Period, your manager/supervisor may discuss your job performance with you. During the course of the discussion, you are encouraged to give your comments and ideas as well. Please understand that completion of the Introductory Period does not assure continued employment for any specified period of time.

(l)    COMPANY VENDORS: If Loan Officer's employment with Smart shall terminate for any reason, then Loan Officer agrees not to contract or use the services of any vendor who provides services to Smart through the use of access code, account number, identifying number, password, user ID, or other code used by Smart, without the prior written consent of an authorized officer of Smart.

(m)    SECURITY/SURVEILLANCE: All public area's in Suite 207 and Suite 201 are under video surveillance 24 hours/7 days per week.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Loan Officer/Processor

RYAN KLAIC

Name

570 N. GRANT ST.

Address

HINSDALE, IL. 60521

City/State/Zip

Loan Officer's Signature

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

Loan Officer's Social Security Number

Smart Mortgage Centers, Inc..

4003 Plainfield/Naperville Rd., Suite 207
Naperville, Illinois 60564

By:

Its:    President

12-27-18



Loan Originator: Ryan Klaic – A Team

Schedule A – Plan A1

Based on 2.25 Lender Comp Plans. If lender comp is different BPS payout will be adjusted accordingly.

As of 1/1/2018 Smart Mortgage Centers will no longer pay over 100 BPS on company generated leads until certain requirements are met.

Volume = 0 – 1,000,000

Company Leads – 100 BPS under 1,000,000 in Volume

Self-Generated – 130 BPS

Volume = 1,000,000 Plus

Company Leads – 130 BPS

Self-Generated – 130 BPS

This is the pay plan that I'm accepting as of DATE: 12 / 29 / 17

Ryan Klaic NMLS #233465 – Signature

Richard Birk - President/Witness – Signature

Employee Retention Agreement Disclaimer: Smart Mortgage Centers reserves the right to change the pay structure by giving you written notice of 30 days.

**SCHEDULE B**

Outside Sales Employee Rider to Smart Mortgage Centers, Inc. Loan Officer Retention Agreement

Notwithstanding anything in the Loan Officer Retention Agreement to the contrary, it is the intention of Smart Mortgage Centers, Inc. and Loan Officer under the Loan Officer Retention Agreement, ("Employee") that Employee's job duties and responsibilities, as set form in this Loan Officer Retention Agreement and Rider, qualify employee for the minimum wage and overtime pay exemption for outside sales employees set forth in section (a)(1) of the Fair Labor Standards Act ("FLSA"), and regulations promulgated there under. Employee understands and agrees that Employee's job duties and responsibilities are such that Employee will be exempt from the minimum wage and overtime pay requirements of the FLSA and therefore, Employee shall be treated by Employer as exempt from the minimum wage and overtime pay requirements of the FLSA and Illinois minimum wage and overtime laws.

Employee's job duties and responsibilities as a Loan Officer for Employer shall consist of the duties outlined in the Loan Officer Retention Agreement including this Rider some but not all of which are described as follows:

1. Employee's primary duty shall be the selling of mortgage loan products offered by Employer;
2. Employee shall meet with prospective borrowers, in person, to sell the mortgage loan products offered by Employer;
3. Employee shall be responsible for originating Employee's own sales by contacting prospective borrowers and by developing and maintaining referral sources;
4. Employee is expected to, and shall, spend a significant amount of time away from Employer's place of business in performing Employee's primary duty of selling the mortgage loan products offered by Employer;
5. Employee is expected to, and shall, meet with prospective borrowers at locations other than Employer's place of business, such as at the prospective borrower's home or other location away from Employer's place of business;
6. Employee's contact with prospective borrowers by telephone, mail or e-mail shall be adjunct to in-person contact with the prospective borrowers;
7. Employee shall obtain credit information and other necessary information and documentation from prospective borrowers for the loan application process;

8. Employee shall make in-person calls on real estate agents and brokers, financial advisor, and other potential referral sources to develop borrower leads;

9. Employee may also engage in marketing and promotional activities in support of Employee's own sales;

10. Employee shall have considerable flexibility in setting employee's own working hours and scheduling the tasks Employee performs during the work day;

11. Employee is expected to, and shall, customarily and regularly be engaged away from Employer's place of business;

12. Employee may spend some time in Employer's office taking loan applications, attending meetings, completing paperwork, preparing marketing and sales materials in support of Employee's own outside sales efforts; and

13. Additional tasks that may be performed at Employer's place of business may include checking and updating databases of loan products for sale and referral sources; calling, writing, or e-mailing borrowers or prospective borrowers with whom Employee has been dealing during Employee's outside sales activities; talking to borrowers or prospective borrowers in the office about their particular loan transaction; calling, writing, or e-mailing prospective borrowers or prospective referral sources with whom Employee may not have had prior contact; and preparing loan applications and other forms of loans initiated or negotiated by Employee during Employee's outside sales activities. Employer's place of business shall mean and include any office of Employer, as well as any fixed site, whether home or office, used by Employee as headquarters or for electronic or telephonic solicitation of sales, regardless of whether Employer is the owner or tenant of the property.

In performing the job duties and responsibilities set forth in this paragraph Loan Officer Retention Agreement and Rider, Employee shall abide by and fully comply with (i) any and all rules, policies, procedures and orders which Employer or Lender's Employer deals with may from time to time adopt or give; and (ii) all applicable federal, state, and local laws, statutes, regulation, rules and ordinances, as currently in effect or hereafter amended, including, but not limited to, the Truth and Lending Act ("TILA") and Regulation "Z" promulgated there under, the Real Estate Settlement Procedures Act ("RESPA") and Regulation "X" promulgated there under, and the Illinois Residential Mortgage License Act of 1987 ( the "Act") and all rules and/or regulations promulgated there under governing Employee's activities as a Loan Officer.

In Agreement herewith the parties have set their hand on the date next to their signature.

Smart Mortgage Centers, Inc.:

Employee:

NAME                    President
                          TITLE